AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

COPY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>KIRAKOS KESABLYAN,<br>Aka KADZHIC KESABLYAN,<br>aka TONY KESABLYAN,<br>aka ALI MOHAMED KESABLYAN,<br>aka KIROS | DOCKET NO.<br><br>**18 MJ00030** |
|---|---|

FILED
CLERK, U.S. DISTRICT COURT
JAN -5 2018
CENTRAL DISTRICT OF CALIFORNIA
BY                               DEPUTY

MAGISTRATE'S CASE NO.

Complaint for violation of Title 18, United States Code, § 912

| NAME OF MAGISTRATE JUDGE<br>HONORABLE GAIL J. STANDISH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATES OF OFFENSES<br>May 11, 2017 | PLACE OF OFFENSES<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 912]

On or about May 11, 2017, in Los Angeles County, within the Central District of California, defendant KIRAKOS KESABLYAN, also known as ("aka") KADZHIC KESABLYAN, aka TONY KESABLYAN, aka ALI MOHAMED KESABLYAN, aka KIROS ("KESABLYAN") falsely pretend to be a United States Marshal, and, in such pretended character, demanded money from victim G.A.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**HANNAH MONROE**        /S/<br>OFFICIAL TITLE<br>Special Agent – FBI |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>January 5, 2018 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA KATHY YU, x. 2431 /y      REC: Detention

## AFFIDAVIT

I, Hannah Monroe, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for KIRAKOS KESABLYAN, also known as ("aka") KADZHIC KESABLYAN, aka TONY KESABLYAN, aka ALI MOHAMED KESABLYAN, aka KIROS ("KESABLYAN") for a violation of Title 18, United States Code, Section 912 (False Impersonation of a Federal Officer or Employee).

2. This affidavit is also made in support of an application for a warrant to search 10325 Horse Haven Street, Sun Valley, California 91352 (the "TARGET LOCATION"), as further described in Attachment A. The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 912 (False Impersonation of a Federal Officer), Title 18, United States Code, Section 1343 (Wire Fraud), and Title 18, United States Code, Section 875 (Interstate Communications)(the "Target Offenses"). Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of

1                    [Instrumentality Procotol]

or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND ON FBI SPECIAL AGENT HANNAH MONROE

4.    I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed for approximately two years.  Prior to becoming an SA, I was a Staff Operations Specialist with the FBI for approximately two years.  I am currently a member of the FBI's Transnational Organized Crime – Eastern Hemisphere squad in Los Angeles, California.

5.    Since joining the FBI in 2014, I have received training in the investigation of violations of criminal law, such as drug-trafficking, computer-related crimes, and financial fraud, including several hundred hours of formal training at the FBI Training Academy in Quantico, Virginia.  During the time that I have been employed by the FBI, I have participated in investigations relating to organized crime, home-grown violent extremism, access device fraud, identity theft, narcotics, and computer intrusions.  I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting electronic and physical surveillance, working with informants, and the execution of search and arrest warrants.  Additionally, I have interviewed and/or debriefed informants, and other witnesses who had personal knowledge regarding the investigations in which I have been involved.  I have experience investigating false

2          [Instrumentality Procotol]

impersonation of federal employee crimes, and I am familiar with
the way in which digital devices are used to facilitate and
commit such crimes.

### III. SUMMARY OF PROBABLE CAUSE

6.    On May 11, 2017, KESABLYAN falsely claimed to be a
United States Marshal in order to get G.A. to pay him money.
G.A. and KESABLYAN were involved in a commercial dispute where
KESABLYAN made repeated demands for more money, culminating in a
May 11, 2017 call in which KESABLYAN said, among other things:
"I never told you this, I'm a U.S. Marshal, you fucking weirdo"
and "Don't fuck with me and my time, dude.  You're fucking with
a federal agent."

7.    KESABLYAN has not been and is not a United States
Marshal.  KESABLYAN is currently living at the TARGET LOCATION,
and based on my training and experience, I believe that those
who falsely impersonate federal officers will have evidence,
fruits, and instrumentalities of that crime at their residence.

### IV. STATEMENT OF PROBABLE CAUSE

8.    Based on my participation in this investigation, as
well as my review of investigative and arrest reports and my
conversations with other law enforcement officers who
participated in this investigation, I know the following
information.

### A.    KESABLYAN and Victim G.A. Decide to Go Into Business Together

9.    In December 2017, FBI Los Angeles and the Los Angeles
Police Department ("LAPD") received information from FBI Dallas

concerning an individual residing in the Los Angeles area named KESABLYAN who had been identified as threatening victim G.A.

10. During an interview of G.A. on December 27, 2017, I learned the following information:

a. G.A., a Texas resident, is a business entrepreneur who is involved in construction, design, development, and investments.

b. G.A. was interested in possible business opportunities in California due to the legalization of cannabis dispensaries.

c. G.A. told me that in April 2017, G.A. met KESABLYAN in Dallas, Texas through a mutual friend. KESABLYAN told G.A. he was a businessman in the Los Angeles area, and G.A. and KESABLYAN discussed potential business startups in Los Angeles.

d. KESABLYAN told G.A. that he operated cannabis dispensaries in California, and that he would like G.A. to assist with developing this line of business. G.A. and KESABLYAN agreed to work together, and to call the business "NoHo Pharmacy."

e. G.A. explained that he agreed with KESABLYAN that G.A. would provide the necessary funds, and due to KESABLYAN's familiarity with California law and cannabis dispensaries, KESABLYAN would acquire the necessary licenses and paperwork.

11. On or about December 31, 2017, I reviewed text messages exchanged between G.A. and 702-781-6188, identified as

KESABLYAN's phone number by G.A., regarding the cannabis
business.

      a.   On April 4, 2017, according to G.A., KESABLYAN
sent a text message to G.A. stating: "Nice to meet u I thing
[sic] we can make lot money together…"  G.A. responded: "you got
it brotha have a safe flight! Let's be in touch. And I'll get to
work soon."  I have seen this text message from G.A.'s phone.

      b.   Later on April 4, 2017, according to G.A.,
KESABLYAN texted G.A. stating: "Need 1.5 million we make 4
million a year."  G.A. responded: "Send me accountant number so
I'll put it together…"  I have seen this text message from
G.A.'s phone.

**B.    KESABLYAN Asks for More Money**

    12.  G.A. also told me the following regarding KESABLYAN's
requests for money:

      a.   On various occasions, KESABLYAN told G.A. that he
needed money for the cannabis dispensary business, but then
refused to provide any documentation acquired with the funds.

      b.   In early April 2017, KESABLYAN told G.A. that in
order to register their new business together with the
California Business Bureau, G.A. would need to pay the fees.
G.A. agreed and gave KESABLYAN $8,570, which was deposited by
KESABLYAN on or about April 4, 2017.

      c.   Based on G.A.'s search of the California Business
Bureau, he could find no record of the business he and KESABLYAN
agreed they would start together, and he thus believed that the
business was never registered.

      [Instrumentality Procotol]

13.   On or about December 31, 2017, I reviewed a copy of the transaction receipt, that G.A. said KESABLYAN texted to G.A., showing G.A. that KESABLYAN had deposited the $8,570.

14.   G.A. also told me that after meeting KESABLYAN, G.A. flew to Los Angeles to meet with KESABLYAN again in April 2017. KESABLYAN introduced G.A. to his family and business associates. KESABLYAN also took G.A. to his marijuana cultivation facility in North Hollywood.

### C.   KESABLYAN Falsely Pretends to be a United States Marshal

15.   On December 27, 2017, G.A. told me that even though KESABLYAN had yet to provide any tangible evidence of their joint venture, he continued to call G.A. numerous times a day demanding more money.  G.A. began to fear for his safety and started recording calls he had with KESABLYAN.[1]

16.   On or about January 3, 2018, I listened to a May 11, 2017 recorded call that G.A. said was between KESABLYAN and G.A. On this call, I heard a voice that G.A. identified as KESABLYAN say the following:

    a.   "You'll see how legit I am.  You're fucking with a Fed."

---

[1] While Texas Penal Code Section 16.02(b) criminalizes the interception of a "wire, oral, or electronic communication," it immediately provides under Section 16.02(c) that an "affirmative defense" applies if the person was "not acting under color of law" when he did so, and "the person is a party to the communication[.]"  Texas Penal Code Section 16.02(c)(4)(A).

  b. "If you want to write this capital, you write it. If not, I'll see you in fucking court, god damn it!  You're playing with the Feds, idiot."

  c. "And I'm going to make sure you go to jail for twenty to thirty years [UI].  Don't fuck with me, dude.  I'm a federal agent.  Do you fucking understand me?"

  d. "I never told you this, I'm a U.S. Marshal, you fucking weirdo."

  e. "Don't fuck with me and my time, dude.  You're fucking with a federal agent."

  f. "You'll spend millions and millions to get out of jail."

  g. "You fucked with my name and I'm going to make sure I fucked with your life."

  h. "You fuck with my name, one little mark on my name, I'm going to put you behind bars."

 17. Based on KESABLYAN's self-identification as a U.S. Marshal and his continued threats, G.A. became more fearful for his safety, and relocated.

 **D. Investigation of KESABLYAN**

 18. On January 3, 2018, I called the U.S. Marshals Service ("USMS") Employment Verification Line and asked if KESABLYAN had been or is a USMS employee.  I was told that no one by that name was employed with the USMS or has been employed with the USMS.

 19. On or about December 31, 2017, I reviewed KESABLYAN's criminal history, and learned the following:

a.    In or around October 2000, KESABLYAN received a misdemeanor conviction for 245(a)(1) Assault with a Deadly Weapon in Fresno Superior Court.

b.    In or around October 2000, KESABLYAN received a misdemeanor conviction for 415 PC Disturbing the Peace in Fresno Superior Court.

c.    In or around September 2008, KESABLYAN was convicted of 2 felony counts of 487(a) Grand Theft in Fresno Superior Court.

d.    In or around September 2008, KESABLYAN was convicted of 2 felony counts of 484(a) Theft in Fresno Superior Court.

e.    In or around September 2008, KESABLYAN received a felony conviction for 115(a) Forgery in Fresno Superior Court.

f.    In or around September 2008, KESABLYAN received a felony conviction for 140(a) Threatening a Victim, Witness, or Informants in Fresno Superior Court.

**E.    Identification of KESABLYAN**

20.   On or about January 5, 2018, I showed a copy of KESABLYAN's photo from his California Department of Vehicles ("DMV") record to G.A.  G.A. identified KESABLYAN as the person with whom he has been in this commercial dispute, and the person that represented he was a U.S. Marshal, as described above.

**F.    Identification of the TARGET LOCATION**

21.   On January 4, 2017, I spoke with Los Angeles Police Department Detective Asatur Mkrtchyan, who told me the following:

a.   Detective Mkrtchyan and law enforcements officers established surveillance at 10325 Horse Haven St., Sun Valley, CA 91352 (the "TARGET LOCATION").  Based on a search of a database named LexisNexis Accurint, (1) KESABLYAN owns the TARGET LOCATION under the name Kadzhic Kesablyan,[2] and (2) the TARGET LOCATION is the current residence for KESABLYAN's wife, Ani Kesablyan aka Ani Khacikyan.

b.   While at the TARGET LOCATION, Detective Mkrtchyan and other law enforcement officers saw a surveillance camera affixed to the front of the TARGET LOCATION.

c.   Detective Mkrtchyan told me that at approximately 8:30 am, on January 4, 2017, he and other law enforcement officers saw a black four-door Audi at the TARGET LOCATION, which was already there when law enforcement began surveillance that morning.  They looked up the license plate and learned it was registered to KESABLYAN under the name Kadzhic Kesablyan.

d.   Detective Mkrtchyan and law enforcements officers then saw a man – later identified as KESABLYAN — get into the Audi alone, the gate to the TARGET LOCATION open, and the man drive away from the TARGET LOCATION in the Audi.

e.   Detective Mkrtchyan and other law enforcement officers followed the Audi, which stopped at 8050 Webb Ave, North Hollywood, California.[3]  KESABLYAN got out of the driver's

_____

[2] G.A. also confirmed that he knows that KESABLYAN also uses the name "Kadzhic Kesablyan."

[3] On or about December 27, 2017, G.A. told me that KESABLYAN took G.A. to 8050 Webb Avenue when G.A. visited Los Angeles, and

side of the Audi, and at that time, Detective Mkrtchyan was able
to identify the man as KESABLYAN based on having seen
KESABLYAN's DMV photo, as well as photos provided to
investigators by G.A.

    22.  Because KESABLYAN was at the TARGET LOCATION prior to
8:30 a.m., the gate to the TARGET LOCATION was seemingly under
his control, and because KESABLYAN's wife has that address
listed as her residence, I believe that KESABLYAN is currently
living at the TARGET LOCATION.

## V.  TRAINING AND EXPERIENCE REGARDING THE TARGET OFFENSES

    23.  Based on my training and experience and familiarity
with investigations into the Target Offensses, as well as
information relayed to me by other law enforcement agents, I am
aware of the following:

         a.   Individuals who engage in false impersonation,
extortionate communications, and wire fraud tend to possess
documents and records reflecting their fraudulent activities,
including logs, bank account statements, business registration
forms, genuine or fictitious income statements and tax records,
receipts from transactions and purchases, check images and
copies, notes regarding their various accounts, wire transfer
receipts, and communications regarding deposits, withdrawals,
and transfers of funds.  Such documents and records are
generally maintained in places where individuals who engage the
Target Offenses can readily access them, often within those

---

that KESABLYAN told G.A. that this location was a marijuana
cultivation facility approved by the city of Los Angeles.

individuals' residences and in detached garages on their property.  Such documents and records also tend to be preserved in electronic form on digital devices in the possession of individuals who engage in fraudulent impersonation, extortionate communications, and/or wire fraud.

b.   Individuals engaged in false impersonation typically store documents to support their false claims of federal employment, including badges, forged credentials, forged paperwork, handcuffs, body armor, law enforcement style tasers, law enforcement style clothing and other equipment or identifiers that may support their false claims of being employed as a federal agent.  These items are often also stored in digital form on digital devices.

c.   Individuals that engage in the Target Offenses go to great lengths to hide and secure their real identities and records relating to their activities involving the impersonation of a federal agent.  This is to safeguard those items against robbery and to keep them hidden from law enforcement.  These items are often hidden by storing them in secure locations, including safes, vaults, or other locked containers.  Other methods of concealment include out buildings, sheds, and exterior closets, the use of natural spaces within walls, furniture, cars, and other areas.  These items are often also stored in digital form on digital devices.

d.   Individuals that engage in the Target Offenses may possess firearms, ammunition, and other dangerous weapons to lend credence to their claims of employment with the federal

government as a member of law enforcement.  They also often keep photographs of such items on their digital devices.

e.    Individuals that engage in the Target Offenses often travel by car, bus, train, or airplane, in connection with their illegal activities in order to meet with co-conspirators or victims.  Documents relating to such travel, such as calendars, travel itineraries, maps, airline tickets, baggage stubs, frequent use club membership information, airline, rental car, and hotel receipts, credit card bills, photographs, videos, passports, and visas, are often kept in their residences, and on their digital devices.

f.    Individuals who engage in extortionate communications and wire fraud tend to possess large quantities of cash and tangible goods purchased using fraudulently obtained funds (including expensive clothing, high-end shoes, and luxury home goods).  Such large quantities of cash and tangible goods are generally maintained in places where individuals who engage in the Target Offenses can readily access them, often within those individuals' residences and in detached garages on their property

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart

phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices. Based on my knowledge, training, and
experience, as well as information related to me by agents and
others involved in the forensic examination of digital devices,
I know that data in digital form can be stored on a variety of
digital devices and that during the search of a premises it is
not always possible to search digital devices for digital data
for a number of reasons, including the following:

     25.  Searching digital devices can be a highly technical
process that requires specific expertise and specialized
equipment.  There are so many types of digital devices and
software programs in use today that it is impossible to bring to
the search site all of the necessary technical manuals and
specialized equipment necessary to conduct a thorough search.
In addition, it may be necessary to consult with specially
trained personnel who have specific expertise in the types of
digital devices, operating systems, or software applications
that are being searched.

     26.  Digital data is particularly vulnerable to inadvertent
or intentional modification or destruction.  Searching digital

                    13        [Instrumentality Procotol]

devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

27.  The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

28.  Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[4] Electronic files saved to a hard drive can be stored for years

---

[4] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

[Instrumentality Procotol]

with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

    29.  Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital

devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a

controlled laboratory environment, and also can require
substantial time.

30.   Further, evidence of how a digital device has been
used, what it has been used for, and who has used it, may be the
absence of particular data on a digital device.  For example, to
rebut a claim that the owner of a digital device was not
responsible for a particular use because the device was being
controlled remotely by malicious software, it may be necessary
to show that malicious software that allows someone else to
control the digital device remotely is not present on the
digital device.  Evidence of the absence of particular data on a
digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

31.   Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a

17      [Instrumentality Procotol]

process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

32. As discussed herein, based on my training and experience I believe that digital devices will be found during the search.

33. I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition. Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

34. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can

unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID.  Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

35.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-

recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017). Apple calls its facial-recognition unlock feature "Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

36.   While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light. Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels. A user can register one or both eyes to be used to unlock a device with these features. To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye. Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features. In addition, Microsoft has a product called "Windows

Hello" that provides users with a suite of biometric features
including fingerprint-, facial-, and iris-unlock features.
Windows Hello has both a software and hardware component, and
multiple companies manufacture compatible hardware, e.g.,
attachable infrared cameras or fingerprint sensors, to enable
the Windows Hello features on older devices.

37.   In my training and experience, users of electronic
devices often enable the aforementioned biometric features
because they are considered to be a more convenient way to
unlock a device than entering a numeric or alphanumeric passcode
or password.  Moreover, in some instances, biometric features
are considered to be a more secure way to protect a device's
contents.

38.   I also know from my training and experience, as well
as from information found in publicly available materials
including those published by device manufacturers, that
biometric features will not unlock a device in some
circumstances even if such features have been enabled.  This can
occur when a device has been restarted or inactive, or has not
been unlocked for a certain period of time.  For example, with
Apple's biometric unlock features, these circumstances include
when: (1) more than 48 hours has passed since the last time the
device was unlocked; (2) the device has not been unlocked via
Touch ID or Face ID in eight hours and the passcode or password
has not been entered in the last six days; (3) the device has
been turned off or restarted; (4) the device has received a
remote lock command; (5) five unsuccessful attempts to unlock

the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

39. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the TARGET LOCATION and reasonably believed by law

enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

40. For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the TARGET LOCATION during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is (a) located at the TARGET LOCATION and (b) falls within the scope of the warrant: (1) compel the use of the person's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

41. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

42.    Based on the foregoing, there is probable cause to believe that KESABLYAN violated Title 18, United States Code, Section 912 (False Impersonation of a Federal Officer).

43.    Further, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of the Target Offenses will be found at the TARGET LOCATION.

|S|
_____
Hannah Monroe
Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this ‾5th‾ on January 2018.

GAIL J. STANDISH

_____
HONORABLE GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

24          [Instrumentality Procotol]

## ATTACHMENT A

PREMISE TO BE SEARCHED

The premises located at 10325 Horse Haven Street, Sun Valley, California 91325 (the "TARGET LOCATION").  The TARGET LOCATION is a two-story single-family home.  The structure consists of beige stucco, brown trim, and a brown tiled roof. The numbers "10325" are affixed in dark color with a rectangle plate to the upper left of the garage door of the residence. The door to the residence is dark in color with decorative iron work.  A large attached garage is located to the west side of the residence facing the street and is beige in color.  The property is surrounded by a cinderblock wall, with metal gates enclosing the driveway of the residence. The search is also intended to include any outbuildings, such as garages, carports, and sheds at the premises.



## ATTACHMENT B

I.  **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of the Target Offenses, namely:

a.   Records, documents, programs, applications, and materials relating to a cannabis dispensary business venture named "NoHo Pharmacy," including but not limited to business registration forms, genuine or fictitious income statements and tax records, and other related documents;

b.   Records, documents, programs, applications, and materials relating to receipts, bank account records, wire transfer records, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money;

c.   Cash, if over $1000;

d.   Records, documents, programs, applications, and materials relating to personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents and other items reflecting names, addresses, telephone numbers, or communications of victims, associates, or others involved in false impersonation and extortionate communications;

e.   Records, documents, programs, applications, and materials relating to alleged employment as a federal agent, including forged credentials, forged paperwork supporting claims of federal employment, handcuffs, body armor, law enforcement

26        [Instrumentality Procotol]

style tasers, law enforcement style clothing and other
equipment;

       f.   Records, documents, programs, applications, and
materials relating to any off-site storage locations, including
safe deposit box keys, records, receipts and rental agreements
for storage facilities;

       g.   Telephones, including cellular telephones,
pagers, beepers, answering machines, and other communication
devices;

       h.   Records, documents, programs, applications, and
materials reflecting travel for the purpose of participating in
the Target Offenses, and/or use of illegal proceeds from the
Target Offenses, including passports, airline tickets, vehicle
rental receipts, DMV registration and ownership records, credit
card receipts, hotel and restaurant receipts, cancelled checks,
maps and records of long distance calls reflecting domestic and
foreign travel;

       i.   Firearms including pistols, handguns, shotguns,
rifles, assault weapons, machine guns, magazines used to hold
ammunition, silencers, components of firearms including
components or tools which can be used to modify firearms,
ammunition and ammunition components including gunpowder,
primers, bullets, shells, wads, shot, and the tools used for the
manufacture of ammunition including reloading devices, dies,
scales, books, pamphlets and documentation, which may be used to
facilitate false impersonation, as well as records, documents,
programs, applications, and materials evidencing the same;

j.    Records, documents, programs, applications, and materials relating to any indicia of occupancy, residency or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents and keys;

k.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

l.    With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.     records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine

whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

       ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

       c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.  If the search determines that a digital device does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

       f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

       g.    The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or] the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

       h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

       5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, with respect to any person who is located at the TARGET LOCATION during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is located at the TARGET LOCATION and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of

the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.